IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL A. HUNT,

       Plaintiff,                         No. CIV S-08-0181 MCE CKD P

   vs.

D. RIOS, et al.,

       Defendants.                FINDINGS & RECOMMENDATIONS

_____/

I. Introduction

       Plaintiff, a state prisoner proceeding pro se, has filed this civil rights action seeking relief under 42 U.S.C. § 1983. In the operative Second Amended Complaint, plaintiff alleges that defendants Rios and Fields retaliated against him for exercising his First Amendment right to file grievances and pursue civil rights litigation. Plaintiff alleges that this retaliation consisted of filing false reports in plaintiff's central file of plaintiff's interactions with members of the Blood disruptive group. (Dkt. No. 36 (SAC), ¶¶ 36-37.) Pending before the court are plaintiff and defendants' respective motions for summary judgment, which are fully briefed. For the following reasons, the undersigned recommends that defendants' motion for summary judgment be granted and plaintiff's motion be denied.

\\\\\

II. Summary Judgment Standards Under Rule 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

\\\\\

On June 23, 2008, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 9.) See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999). On July 12, 2012, the court issued a second Rand notice to plaintiff pursuant to the Ninth Circuit's recent decision in Woods v. Carey, No. 09-15548 (9th Cir. July 6, 2012), and granted plaintiff leave to file additional materials in a supplementary opposition to defendants' motion for summary judgment. (Dkt. No. 79.) On July 26, 2012, plaintiff filed a supplementary opposition. (Dkt. No. 82.)

III. Discussion

A. Legal Standard

Plaintiff alleges that, between January 27, 2007 and April 17, 2007, in retaliation for filing a civil rights suit and prison grievances, defendants filed false reports of gang affiliation in his central file, and that these actions did not advance any legitimate penological interest. (SAC, ¶¶ 36-37.)

To establish a First Amendment retaliation claim, plaintiff must show: (1) an adverse action against him; (2) because of; (3) his protected conduct, and that such action; (4) chilled his exercise of his First Amendment rights; and (5) the action did not reasonably advance a legitimate correctional goal. Rhodes v. Robinson, 408 F.3d 559, 567–68 (9th Cir. 2005). Prisoners alleging retaliation claims must demonstrate that: (1) prison officials retaliated against them for exercising their constitutional rights; and (2) the retaliation did not advance legitimate penological interests, such as the preservation of institutional order, discipline, and security. Barnett v. Centoni, 31 F.3d 813, 816 (9th Cir. 1994). Even if an inmate shows that the defendants' action was retaliatory, the inmate's retaliation claim still fails unless he produces significant probative evidence demonstrating that the retaliatory action did not advance a legitimate penological interest. Id. at 815–16. "The plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the [retaliatory] conduct [at issue]." Pratt

v. Rowland, 65 F.3d 802, 806 (9th Cir.1995).

B. Factual Background

      At all relevant times, plaintiff was a state prisoner housed at California State Prison-Sacramento ("CSP-Sac"). (PUF, ¶ 2; DUF, ¶1.[1]) Defendant Rios was a Correctional Sergeant assigned to B facility at CSP-Sac, and defendant Fields was a Correctional Officer assigned to B facility. (PUF, ¶ 3; DUF, ¶ 3.)

      In September 2002, prison officials partially granted an inmate appeal by plaintiff challenging his listing as a member of the Blood disruptive group. The First Level Reviewer reviewed plaintiff's central file and "could not find any reference or documentation for your being listed" as a member of the Bloods or any other disruptive group. Thus, the reviewer "directed staff to change your designation on all yard listings as being non-affiliated." (Dkt. No. 60 at 16 (Plaintiff's Ex. A).)

      In March 2004, plaintiff filed a federal civil rights action in the case Hunt v. McKay, No. 2:04-cv-0435 LKK JFM (E.D. Cal.) ("McKay"), alleging that his due process rights were violated when a correctional officer named S. Vance improperly placed plaintiff's name on a list of suspected Blood gang members, associates, or sympathizers, causing plaintiff to be locked down for twelve days.[2] (See McKay, Dkt. No. 81.)

      On December 19, 2006, plaintiff declined to appear before the B Facility Unit Classification Committee (UCC) for the purpose of annual review and program evaluation. The UCC noted that a December 1998 evaluation would "serve as the basis for [plaintiff's] case factors," and opted to continue plaintiff's present program. (Dkt. No. 60 at 22.) In the December 1998 evaluation, plaintiff's gang affiliation was noted as "None." (Id. at 23.)

---

[1] Plaintiff's Undisputed Facts, Dkt. No. 60-2; Defendants' Undisputed Facts, Dkt. No. 65-2.

[2] On August 3, 2007, after the events giving rise to the instant action, summary judgment was granted for defendant Vance. (McKay, Dkt. No. 93; see PUF, ¶ 4.)

On December 25, 2006, a riot occurred on B facility at CSP-Sac involving thirty to forty inmates identified as being affiliated with the Blood and Crip disruptive groups. (PUF, ¶ 6; DUF, ¶ 4.) Defendants assert that, after custody staff had controlled the riot, all inmates housed in B facility were put on lockdown status; plaintiff asserts that "all Black inmates, including Plaintiff," were put on lockdown. (DUF, ¶ 5; PUF, ¶ 6.) On January 5, 2007, all non-affiliated inmates were returned to normal programming, while inmates affiliated with the Blood and Crip disruptive groups remained on lockdown. Plaintiff's name appeared on the list of affiliated inmates, which identified him as a Blood associate; thus he remained on lockdown. (PUF, ¶ 7; DUF, ¶¶ 6, 7.)

On January 6, 2007, plaintiff submitted a grievance challenging his classification as a Blood affiliate. (PUF, ¶ 8; DUF, ¶ 8.) On January 17, 2007, all Blood and Crip affiliated inmates were permitted to return to normal programming, including plaintiff. (PUF, ¶ 9; DUF, ¶ 9.)

On January 27, 2007, defendant Rios interviewed Hunt regarding his grievance filed January 6, 2007. (PUF, ¶ 10; DUF, ¶ 10.) During the interview, plaintiff told Rios that he should not be listed as a Blood affiliate, as he had no association with that group. Plaintiff told Rios that there was no evidence in his central file stating that he was an affiliate of the Bloods, and therefore he should be taken off the Blood list. (PUF, ¶ 11; DUF, ¶ 12.) Plaintiff told Rios about the McKay lawsuit, which addressed similar gang validation issues, and asked to see the evidence that was being used to identify him as a gang associate. ( PUF, ¶¶ 11-12; DUF, ¶ 13.) Rios informed plaintiff that this information was confidential, and not available for plaintiff to review. (PUF, ¶ 12; DUF, ¶ 14.)

Defendants' Exhibit C

Defendants assert that, prior to the January 27, 2007 interview, Rios reviewed plaintiff's central file, which included some confidential chronos about plaintiff's involvement with the Blood disruptive group. (Decl. of Rios (Dkt. No. 65-3), ¶ 3.) These confidential

chronos are reproduced as defendants' Exhibit C.  (Decl. of Rios, ¶ 3.)  On July 9, 2012, this court granted defendants' motion to receive defendants' Exhibits A and C under seal and for in camera review.  (Dkt. No. 77.)

        Defs.' Exhibit C consists of reports documenting confidential interviews with inmates dating from 2000, 2005, and 2007, respectively.  In a January 2000 interview with a confidential informant considered credible, plaintiff was identified as a leader in a Blood-related Sacramento street gang.  (Ex. C. at 13-14.)  The report documenting the 2000 informant interview also described a 1998 confidential report in plaintiff's file concerning weapon-related, and possibly gang-related, activity by plaintiff.  (Id. at 15.)  In a February 2000 interview, a confidential informant described plaintiff as a drug dealer on the B facility yard.  (Id. at 17.)  In a 2005 interview with two confidential informants deemed credible, plaintiff was described as a respected affiliate of the Sacramento Bloods.  (Id. at 18.)  In a 2007 interview with a confidential informant, plaintiff was identified as a member or associate of the Blood disruptive group.  (Id. at 21.)[3]

        Rios further declares that plaintiff's cellmate at the time, inmate Fulgham, was involved in the riot and deemed to be a victim.  Fulgham "is a documented Blood disruptive group associate" who had formerly been housed with plaintiff, and was re-housed with him soon after the Christmas Day riot and two days before plaintiff's interview with Rios.  (Decl. of Rios, ¶ 7.)  Rios declares that, to his knowledge, plaintiff never requested a different cellmate during the period he was housed with Fulgham.  (Id., ¶ 12.)  In deposition testimony, plaintiff acknowledged that his cellmate had participated in the Christmas Day riot and was a "suspected Blood" who had told plaintiff that he was a Blood.  (Hunt. Depo. (Dkt. No. 65-6), 41:4-16.)

\\\\\

---

[3] The court understands defendants to assert that, prior to his January 27, 2007 meeting with plaintiff, Rios reviewed the confidential chronos in Defs.' Exhibit C dating from 2000 and 2005 (as the 2007 interview had not yet occurred).

Defendants' Exhibit B / Alleged Retaliatory Chrono #1

Defendants assert that, the day before he met with plaintiff, Rios observed plaintiff participate in a meeting on the yard with known admitted members of the Crips, Bloods, and Kumi disruptive groups. (Decl. of Rios, ¶ 6.) Rios declares that such meetings "often occur following problems or differences that lead to such incidents as the Christmas Day Riot, which involved several members of the Crip and Blood disruptive groups." (Id.) In contrast, plaintiff "vehemently den[ies] associating with any Crip, Blood, and Bay Area (415 Kumi) disruptive groups as alleged by Rios[.]" (Decl. of Hunt, ¶ 12.)

In its July 9, 2012 order, the court denied defendants' motion to seal as to defendants' Exhibit B, which has been served on plaintiff. (Dkt. No. 80.) Exhibit B is a copy of a chrono authored by Rio on January 27, 2007.

It is plaintiff's position that Rios placed the Exhibit B chrono in plaintiff's file in retaliation for filing prison grievances and the McKay litigation. (SAC, ¶¶ 18-20; Decl. of Hunt, ¶ 11; Dkt. No. 60 at 8.) Exhibit B states that Rios and yard staff saw plaintiff participating in a large meeting held by known gang members from all the disruptive groups on January 26, 2007. (Dkt. 80-1 (Ex. B).) Exhibit B further states:

> On Saturday, 1-27-2007, while conducting an appeal 602 interview . . . with Hunt, he described that the meeting he attended was everyone on the yard coming to an understanding that no one from any of the groups should be out on the yard drunk. HUNT claims he is a non-affiliated inmate and has been informed by me and other yard staff that his association with any validated / self-admitted disruptive group members could be grounds to validate him as a disruptive group member. A review of HUNT'S central file reveals that he has no information other than Confidential reports that implicate him as an associate of the Bloods disruptive group.

(Id.)

In his supplemental opposition to summary judgment addressing Exhibit B, plaintiff again "denies that he participated in any large meeting with known gang members" (Dkt. No. 82; see Decl. of Hunt (Dkt. No. 68-1), ¶ 12), and further denies "ever admitting to being a

8

part of any meeting with those groups[.]"

Plaintiff asserts that after his January 2007 meeting with Rios, Rios "directed or ordered Defendant Fields, B-Facility yard staff, to place documented evidence of Plaintiff's gang membership or gang activity in Plaintiff's central file" in retaliation for plaintiff's protected First Amendment activities. (Decl. of Hunt, ¶ 21.) In his declaration, Rios asserts: "The fact that Hunt had limited information in his central file regarding his gang association at that time, led me to recognize that my staff needed to document their observations of Hunt's gang activity." (Decl. of Rios, ¶ 8.) Thus, "I directed my staff to document all observed gang association and involvement by inmates, not just Hunt[,]" for reasons of institutional safety and security. (Id.)

<u>Defendants' Exhibit A / Alleged Retaliatory Chrono #2</u>

On February 16, 2007, defendant Fields authored a chrono stating that she had observed plaintiff associating with known Blood disruptive group members on February 14 and 21, 2007.[4] She further stated that she and B facility yard staff had been monitoring Hunt's activities for the past two years, and had observed Hunt to mainly associate with inmates identified as Sacramento Bloods. "Whenever Hunt is present on the yard he is in the company of at least one inmate identified as a Blood associate[,]" Fields stated. A copy of this chrono is submitted as defendants' Exhibit A, ordered sealed by the court on July 9, 2012. (Dkt. No. 77.)

It is plaintiff's position that this chrono is both false and retaliatory in nature. (Decl. of Hunt, ¶¶ 14-16; <u>see</u> Dkt. No. 60 at 8.) He "vehemently den[ies] associating with any Blood gang members as alleged by Defendant Fields and most certainly deny associating on the two dates as alleged because I was actively pursuing civil rights litigation in court to prove my non-affiliated status, and did not go to the yard on those dates." (Id., ¶ 15.)

On April 17, 2007, while Hunt was reviewing his central file, he discovered a note indicating that Rios and Fields had placed chronos in his file concerning his suspected affiliation

---

[4] The court assumes that the "February 21, 2007" date is erroneous, as Fields' chrono is dated five days earlier.

9

with disruptive groups. (SAC, ¶ 25; DUF, ¶ 20.) Two days later, plaintiff filed an inmate appeal alleging that defendants had placed gang information into his central file in retaliation for him submitting prison grievances and filing lawsuits. (SAC, ¶ 22; DUF, ¶ 21.) Defendants assert that accurate lists of inmates that are associated with disruptive groups are imperative to prison safety and security. (DUF, ¶¶ 24-25.)

Plaintiff commenced the instant action on January 25, 2008. (Dkt. No. 1.)

C. Analysis

As described above, plaintiff alleges that, after he filed a grievance complaining of being listed as gang-affiliated, and following his interview with Rios on January 27, 2007, Rios placed a retaliatory chrono in his central file. He further alleges that in February 2007, as directed by Rios, Fields placed a retaliatory chrono in his file. Both these chronos (defendants' Exhibits B and A, respectively) describe plaintiff's associations with members of the Bloods disruptive group, as observed (or purportedly observed) by Rios and Fields. Both chronos note plaintiff's claim to be non-affiliated.

In a First Amendment retaliation claim, the prisoner bears the burden of pleading and proving the absence of a legitimate correctional goal for the conduct of which he complains. See Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir.1995). Courts considering retaliation claims brought by prisoners must keep in mind the potential for "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'" Pratt, 65 F.3d at 807 (quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)). In particular, courts should " 'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." Id. (quoting Sandin, 515 U.S. at 482).

As to the allegedly retaliatory chrono filed by Rios (Exhibit B), plaintiff has not carried his burden of proving the absence of a legitimate correctional goal. To be sure, in December 1998, September 2002, and as recently as the December 2006 UCC evaluation,

plaintiff was not considered gang-affiliated.  However, defendants' Exhibit C documents that plaintiff was identified as Blood-affiliated by more than one confidential informant over a period of several years.  Plaintiff's cellmate was a Blood associate who was involved in the December 2006 riot.  Yet plaintiff and Rios agree that, as of January 2007, there was nothing in plaintiff's central file (other than the confidential reports in Defs.' Exhibit C) indicating that plaintiff had associated with gang members.

It appears that what plaintiff saw as vindication, defendant Rios considered an oversight.  The lack of non-confidential gang documentation in plaintiff's file "led me to recognize that my staff needed to document their observations of Hunt's gang activity."  (Decl. of Rios, ¶ 8.)  Thus, following his January 27, 2007 interview with plaintiff, Rios filed a chrono describing plaintiff's participation in a meeting with known gang members on the previous day.  (Defs.' Ex. B.)  The chrono noted plaintiff's verbal assertion that he was non-affiliated.  (Id.)  Even if this chrono was filed in retaliation for plaintiff's grievance and/or lawsuit, plaintiff has not created a triable issue of material fact that the chrono did not reasonably advance a legitimate correctional goal.  Defendants have produced sufficient evidence to show that the chrono reasonably advanced the correctional goal of keeping accurate lists of inmates associated with disruptive groups.

Plaintiff has also failed to prove the absence of a legitimate correctional goal as to the allegedly retaliatory chrono filed by Fields (Defs.' Exhibit A).  After being directed by Rios to document observations of gang activity, Fields filed a chrono stating that, for two years, she had "observed Hunt mainly to associate with inmates identified as Sacramento Bloods[.]"  (Defs.' Ex. A.)  She named particular inmates who fit this description, and noted that "[w]henever Hunt is present on the yard he is in the company of at least one inmate identified as a Blood associate."  She also noted that "Hunt continues to deny being an affiliate or member of" the Bloods.  (Id.)  Plaintiff has not produced "significant probative evidence" that this chrono did not advance a legitimate correctional goal.  See Barnett, supra, 31 F.3d 813, 815-816.  In light of

the Exhibit C confidential reports in plaintiff's file, Rios' Exhibit B chrono, and Rios' directive to Facility B staff, defendants have shown that the chrono reasonably advanced the goal of institutional security.

Accordingly, IT IS HEREBY RECOMMENDED THAT:

1. Defendants' February 13, 2012 motion for summary judgment (Dkt. No. 65) be granted;

2. Plaintiff's December 20, 2011 motion for summary judgment (Dkt. No. 60) be denied; and

3. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: August 21, 2012

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

2
hunt0181.msj